642 S.E.2d 590

**Joseph Lee ARD, Respondent,**

v.

**William D. CATOE, Commissioner, South Carolina Department of Corrections, Petitioner.**

No. 26282.

Supreme Court of South Carolina.

Submitted Sept. 20, 2006.

Decided March 5, 2007.

Rehearing Denied April 4, 2007.

320

Attorney General Henry Dargan McMaster, Chief Deputy Attorney John W. McIntosh, Assistant Deputy Attorney Gen-

eral Donald J. Zelenka, Assistant Attorney General Melody J. Brown, all of Columbia, for Petitioner.

William N. Nettles, of Sanders & Nettles, of Columbia, and Christopher Seeds, of New York, for Respondent.

Justice WALLER:

We granted the State's petition for a writ of certiorari to review the grant of post-conviction relief (PCR) to respondent, Joseph Lee Ard, who was sentenced to death for killing his pregnant girlfriend, Madalyn Coffey, and their unborn son. We affirm the PCR court's grant of a new trial based on ineffective assistance of trial counsel.

## FACTS

On April 23, 1993, at approximately 5:30 a.m., Coffey died from a single gunshot wound to her forehead. She was 17 years old and 35 weeks pregnant at the time; the viable fetus died from a lack of oxygen. There were no eyewitnesses to the shooting. Respondent was tried for two counts of murder.

During the guilt phase of trial, the State presented over 20 witnesses. Witnesses for the State testified they heard respondent threaten to kill Coffey and that he told Coffey he wished she and the baby were dead. Respondent's friend, Jay Johns, testified that he was with respondent and Coffey in the trailer just before the shooting, but had gone outside "to get a beer" when he heard "a pop." Johns went back inside the trailer; when Johns asked respondent what happened, he said "I think I killed her." Johns called 911, and respondent fled the scene.[1]

SLED agent Joseph Powell testified for the State as an expert in gunshot residue analysis. Two types of samples, alcohol swabs and scanning electron microscope (SEMS) tabs, had been taken from Coffey's hands. Powell stated that he first "ran the swabs . . . to see if we could find any amount,

---

1. Johns also testified that he told respondent he was going to call the police and asked respondent what he should tell them. According to Johns, respondent replied: "Tell them I did it and they will have to catch me." On cross-examination, however, trial counsel referred to Johns' written statement given to police on the date of the incident which did not include the phrase "they will have to catch me."

any elevated elements of materials. The elements we are looking for are materials call[ed] barium, antimony and lead." Powell explained that these are the three elements which are found in gun primer residue. Powell testified that after the initial test on the swabs was complete, "[t]he values were not sufficient for a positive cause that there was gunshot residue, but there was **an indication.**" (Emphasis added).

Therefore, Powell ran the SEMS test to see if there were "any actual physical particles that would have been found from gunshot residue." Powell stated that there were "several particles which were **very interesting,** but there was not any **or enough** material for us to be able to call gunshot residue; thus, [Coffey] ha[d] no gunshot residue on her hands." (Emphasis added). The following colloquy then occurred:

Q. When you say no gunshot residue on her hands, can you rule out her having pulled the trigger on that gun?

A. There is no gunshot residue on her hands. If she had fired the weapon, the material that would have come from this gun would have had to have been removed before the test would have been administered.

Trial counsel did not cross-examine Powell.[2]

Former SLED Agent Michael Avery also testified regarding gunshot residue. Avery stated that he was Powell's supervisor when the samples in this case were tested.[3] Avery stated he reviewed Powell's examination and confirmed Powell's conclusions. In addition, the State elicited the following testimony:

Q. As a matter of fact, the defense has since hired you to review that?

---

**2.** However, when Powell was recalled by the State in reply, respondent's counsel did cross-examine him about how most of the gunshot residue would have been expelled through the end of the barrel of the gun. Trial counsel also questioned Powell regarding the fact that samples from Coffey's hands might not have been taken until after the body was moved to the hospital for the autopsy and that moving the body around might cause removal of the residue.

**3.** The gunshot residue analysis was performed by Powell in 1993. Avery left SLED in 1995. Prior to the April 1996 trial, respondent's counsel hired Avery as a consultant to re-examine the analysis which had been done by Powell and reviewed by Avery.

A. Yes, sir.

Q. Again. And you still confirm Joe Powell's conclusions?

A. Yes, sir, the conclusion of the test results, which was no gunshot residue.

The defense at the guilt phase put up over 10 witnesses. Several defense witnesses testified that respondent was excited about becoming a father and respondent and Coffey acted like they loved each other.[4] There was also testimony respondent did not threaten or abuse Coffey and that he was planning on getting a ring for, and marrying, Coffey.

Respondent took the stand in his own defense and testified Coffey's killing was an accident. He explained that he and Coffey were in a motel bathroom while Johns and his girlfriend were fighting in the motel room. Coffey was upset and crying because respondent had been spending time in Atlanta with another woman. When Johns and respondent went to leave the motel room, Coffey asked if she could go with respondent; he agreed. Johns, respondent, and Coffey then left the motel room and drove to Johns' trailer. Respondent testified that Coffey sat on the couch while he kneeled on the floor. When respondent told Coffey he was going to Atlanta the next day and she could not go with him, respondent stated that Coffey "got real upset." Respondent testified that Coffey had his gun in her hand and told him she did not love him. When respondent denied he was going to Atlanta to be with the other woman named Maurer, Coffey said "You're lying. You just want to go down there and screw Maurer some more. You don't love me or the baby. We might as well be dead." Respondent testified that she then pulled the hammer back on the pistol, cocking the gun.[5] According to respondent, he tried to lean forward to grab the gun, Coffey "turned real quick" and when he grabbed the cylinder gap of the gun, "it went off."

---

**4.** These matters were also testified to on cross-examination by some of the State's witnesses.

**5.** The State's firearms expert testified that the gun, a Charter Arms .44 caliber double action revolver, required only three to three and one quarter pounds of pressure on the trigger to cause the gun to fire when the gun was cocked.

Coffey fell over. Respondent tried to pick her up, got "stuff and blood" on his hands, "freaked out" and fled to Atlanta. After three days of taking pills, sleeping, and crying,[6] respondent returned to Columbia with the gun, and his parents took him to an attorney. As they were making arrangements in the attorney's office to turn respondent in to the Lexington County Sheriff's Department, he "blacked out" and woke up in the hospital.

In the State's closing argument, the State argued that respondent killed his victims with malice. Specifically, the State argued to the jury that the gunshot residue tests were important, and because there was no residue on Coffey's hands, respondent's accident defense did not hold up:

... Why are these so important? Because if there is no gunshot residue on her hands, as Joe Powell told you, then her hand wasn't on that gun when it went off. Her hand wasn't near that gun when it went off. Her hands were somewhere aside from on this gun.

That's why they are so important. They can't attack Joe Powell. They can't attack him because their own expert, Mike Avery, was hired by the defense to review Mr. Powell's work.

[Objections by defense, which were overruled.]

... He found no fault with Joe Powell's findings, that those findings were correct.

Now, if the findings are correct, if the findings from these are correct, then the only thing they can do is attack the way it's collected. If they can't attack the results, they have got to attack the way it's collected.[7]

. . .

---

6. One of the State's witnesses on cross-examination corroborated that when she saw respondent during this time in Atlanta, he was upset or sleeping. One of respondent's witnesses, Jerry Logue, testified that while respondent was staying at his apartment these days in Atlanta, he was upset, crying, did not eat, and spent most of the time sleeping.

7. Throughout the guilt phase, the defense consistently challenged, both on cross-examination of State witnesses and through defense witnesses, the manner in which evidence was collected and the processing of the crime scene.

Why is it so important that these tests be discounted? Because if they can't discount Joe Powell, if they can't discount those tests, then they can't get past the fact that there is no residue and then everything else they have raised is absolutely irrelevant, everything.... They have got to—got to—discount the value of those tests.

... No gunshot residue. None. What does that tell y'all? What does that tell y'all?

In addition to murder, the trial court charged the jury on involuntary manslaughter and accident. After one hour of jury deliberations, the jury requested a "definition of" involuntary manslaughter and murder; the trial court recharged the jury on those two offenses. After another 45 minutes of deliberation, the jury found respondent guilty of the murder of Coffey and the unborn child. After a lengthy sentencing phase with numerous witnesses for both sides, the jury returned a recommendation of death.

Respondent appealed, raising four issues related only to the sentencing phase. This Court affirmed the death sentence.[8] *State v. Ard*, 332 S.C. 370, 505 S.E.2d 328 (1998) (Moore, J., concurring in separate opinion in result only; Gregory, A.J., concurring in majority opinion in result only).

Respondent filed for PCR. The PCR court found that trial counsel had failed to adequately investigate and challenge the State's gunshot residue evidence and therefore granted respondent a new trial based on ineffective assistance of counsel.[9]

---

8. *Ard* was the first South Carolina case where feticide was used to support the death penalty. This Court held that the Legislature intended to include a viable fetus as a "person" or "child" as those terms are used in S.C.Code Ann. §§ 16–3–20(C)(a)(9) & (10), the aggravating circumstances of murdering "two or more persons" and "murder of a child eleven years of age or under."

9. In addition, the PCR court granted respondent a new sentencing trial based on appellate counsel's failure to raise on direct appeal an issue involving the trial court's dismissal of a juror during the sentencing phase. Because we affirm the PCR court's grant of a new trial to determine guilt, we need not address the State's remaining issue related to sentencing. *See Whiteside v. Cherokee County Sch. Dist. No. One*, 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (appellate court need not address remaining issues when resolution of prior issue is dispositive).

## ISSUE

Did the PCR court err in finding ineffective assistance of counsel based on trial counsel's failure to adequately investigate and challenge the State's gunshot residue evidence?

## DISCUSSION

The State argues the PCR court erred in finding ineffective assistance of trial counsel. Specifically, the State argues trial counsel were not deficient because they reasonably investigated the gunshot residue evidence by hiring former SLED agent Avery as a gunshot residue expert and reasonably relying on Avery's advice. The State further argues that even assuming deficiency, there is no prejudice. We disagree.

We find the PCR court's factual findings regarding deficiency and prejudice are well supported by the evidence presented at the PCR hearing. A review of the relevant evidence is in order.

After filing for PCR, respondent deposed Powell, the SLED gunshot residue expert, in October 2001; Powell testified for the State at the PCR hearing in April 2004. At both the deposition and the hearing, Powell stated that his testimony at trial was based on the SLED protocol **in use at that time.** Based on this protocol, he accurately reported a finding of negative for gunshot residue. Powell explained that SLED's standard at the time was to report a positive conclusion of gunshot residue **only** if perfectly round gunshot residue particles were detected, which specifically meant spherical particles containing barium, antimony and lead. However, he further explained that as time went on, there were concerns that when non-round particles with the three required elements were found, or perfectly round lead particles were found, these findings should not be reported as a negative finding, but rather as "inconclusive."

Regarding the instant case, he stated that if the analysis was conducted under the modern protocol, his conclusion would be that two particles on Coffey's right back hand were inconclusive for gunshot residue. Powell explained that an "inconclusive" finding meant it was not consistent with the

person firing the gun, **but could be consistent with the person handling the weapon.**[10]

Even more significant, however, was Powell's testimony that had respondent's counsel cross-examined him at trial regarding his statement that "several particles ... were very interesting," he would have testified that although the evidence from Coffey's hands did not meet SLED's threshold for positively identifying it as gunshot residue, the evidence could have been associated with gunshot residue.[11] Furthermore, Powell stated that if defense counsel had met with him prior to trial to discuss the test results, he would have explained what he found "interesting" about them. In other words, if counsel had asked, **either prior to trial or at trial,** Powell would have explained that the evidence from Coffey's hands, which revealed at least two particles with the three required elements, was consistent with gunshot residue and could have come from her handling a weapon.

Trial counsel Jack Duncan and Elizabeth Fullwood both testified at the PCR hearing. Both attorneys testified there was an extreme delay in receiving the requested discovery materials from the solicitor's office.[12] These discovery materi-

---

10. At his deposition, Powell specifically stated the following with regard to Coffey's gunshot residue tests:

If this person had handled the gun, grabbed it in some way, done [sic] something to knock it away this could be consistent with it. I have seen this happen where people have handled weapons. I've seen chunky [i.e., non-round] particles and I've seen—this is well within the realm of possibility.

During his direct examination at the PCR hearing, Powell stated that under the "current protocol," the results would permit a finding of "may be consistent with gunshot residue."

11. Powell specifically stated at the PCR hearing that if counsel had questioned him about the "interesting" particles, he would have testified as follows: " 'The report is reading as no gunshot residue detected, and that is my position, but there are some things here which if—can they come from a gun? Yes. But they may not be from a gun.' " Likewise, at the deposition, Powell stated that because there were two (non-round) particles found on Coffey with the required three elements, this "absolutely" indicated—even in 1996, the time of trial—that a weapon was involved. Regarding those two particles, Powell stated "[t]hat is absolutely something which I do not find without usually a weapon."

12. Although counsel had filed discovery motions in March 1994, Duncan and Fullwood testified they received 1200 pages of documents on

als included the gunshot residue test results analyzed by Powell and dated October 1993. They did not receive the underlying "raw data" for the gunshot residue tests until March 1, 1996 after making a specific additional request for the data. Duncan testified that receiving the "no gunshot residue" finding in February 1996 created "a big hole in [the] theory of the case" which was accident. Likewise, Fullwood testified that respondent had a "good defense" to the guilt phase until the gunshot residue tests undermined the accident defense; Fullwood and Duncan both stated that they could not explain why Coffey did not have gunshot residue on her hands. According to Duncan, the prosecution "exploited" this "hole" to argue in closing that respondent's version of events could not have happened.

As to retaining Avery, Powell's former SLED supervisor, as a defense expert, Fullwood testified Avery was hired "[t]o see if he could help us understand and explain the results of the gunshot residue tests SLED had conducted." [13] Duncan testified that after Avery told them there was nothing "useful," i.e., "nothing for [counsel] to question," in the gunshot residue tests, they tried to develop theories as to why Coffey did not have gunshot residue on her hands, such as the way this evidence was collected and preserved. Counsel did not request that Avery independently re-test the gunshot residue evidence.

Duncan further testified that counsel did not cross-examine the State's witnesses related to the gunshot residue test results because they "didn't want to draw any more attention to it" since they "had no response to what they had to say." When Duncan was asked about Powell's deposition testimony which showed Powell would have testified in a manner favorable to the defense if counsel had asked him certain questions,

---

February 2, 1996. When trial counsel received this discovery was approximately when they first were informed the trial would be in April 1996. Counsel moved for a continuance in March 1996, but the trial court denied the motion.

13. When asked if Avery was counsel's first choice for a gunshot residue expert, Fullwood responded, "Well the thing was that there wasn't—We were under such time constraints there was no such thing as trying to make a choice about anything."

Duncan acknowledged that "the answers would have helped [the defense] immensely."

Finally, respondent presented his own gunshot residue expert at the PCR hearing, Robert White. In contrast to Powell, White **positively** identified several particles of gunshot residue from Coffey's tests. In White's opinion, as long as a particle contains the three required elements (barium, antimony, and lead) and is round-ish in shape (as opposed to crystalline, or spiky), then the particle constitutes unique gunshot residue. In addition, White found several particles "characteristic of gunshot residue," which he defined as "other particles of lead, barium and antimony in combinations of two or alone." White testified a person could get unique and characteristic particles from picking up a gun, firing a gun, or being close to a gun going off.

The PCR court ruled that trial counsel's failure to adequately evaluate and challenge the State's gunshot residue testimony was deficient performance that resulted in prejudice to respondent. As to deficiency, the PCR court concluded trial counsel failed to: (1) "aggressively re-examine" the gunshot residue reports; (2) "read the documents, evaluate them, and pursue the necessary next steps, such as consulting an appropriate," i.e., "an independent expert;" and (3) "investigate the possibility of retesting the samples." As to prejudice, the PCR court found that the "extent to which the jurors credited Powell's testimony . . . was critical to the outcome of the case." Moreover, the PCR court noted that "[d]efense counsel's failure to refute gunshot residue evidence transformed an arguable case into a clear case. . . . Because of the solicitor's critical reliance on the absence of gunshot residue evidence, there is little question that the tenor of the jury deliberations would have been different, but for counsel's mistakes." Finally, the PCR court stated it was not "confident that a jury, adequately informed, would have convicted [respondent] of murder."

The State first argues the PCR court erred because respondent has not proved trial counsel was deficient. The State contends that counsel reviewed SLED's gunshot residue report and consulted with an expert. According to the State, because the expert reported he was satisfied with the report,

counsel then reasonably focused their strategy on attacking the way the evidence was collected. In addition, the State maintains there could be no prejudice. We disagree.

In a PCR proceeding, the burden is on the applicant to prove the allegations in his application. *E.g., Bannister v. State,* 333 S.C. 298, 509 S.E.2d 807 (1998). This Court will uphold factual findings of the PCR court if there is any evidence of probative value to support them. *Webb v. State,* 281 S.C. 237, 314 S.E.2d 839 (1984). The Court will reverse the PCR court's decision when it is controlled by an error of law. *Pierce v. State,* 338 S.C. 139, 145, 526 S.E.2d 222, 225 (2000).

There is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions in the case. *E.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Cherry v. State,* 300 S.C. 115, 386 S.E.2d 624 (1989). In order to prove that counsel was ineffective, the PCR applicant must show that: (1) counsel's performance was deficient; and (2) there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington, supra; Rhodes v. State,* 349 S.C. 25, 561 S.E.2d 606 (2002). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* Furthermore, when a defendant's conviction is challenged, "the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. 2052.

Without a doubt, "[a] criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation." *Thompson v. Wainwright,* 787 F.2d 1447, 1450 (11th Cir.1986); *see also Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. 2052. When evaluating the reasonableness of counsel's conduct, "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. 2052. Moreover, while the scope of a reasonable investigation depends upon a number of issues, "at a minimum,

counsel has the duty to interview potential witnesses and to make an **independent** investigation of the facts and circumstances of the case." *Troedel v. Wainwright,* 667 F.Supp. 1456, 1461 (S.D.Fla.1986), *aff'd,* 828 F.2d 670 (11th Cir.1987) (emphasis in original).

The American Bar Association (ABA) has specifically provided guidelines for defense counsel's performance regarding investigation of a capital case: "Counsel at every stage have an obligation to conduct thorough **and independent** investigations relating to the issues of both guilt and penalty." *American Bar Association Guidelines For The Appointment And Performance Of Defense Counsel In Death Penalty Cases, reprinted in* 31 Hofstra L.Rev. 913, 1015 (2003) (emphasis added) (hereinafter *"ABA Guidelines"*).[14] With respect to forensic evidence, the ABA directs the following: "With the assistance of appropriate experts, counsel should [] aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." *Id.* at 1020.

In our opinion, the PCR court correctly found ineffective assistance of counsel. We find respondent proved that trial counsel should have further investigated and more thoroughly challenged the gunshot residue evidence. Furthermore, the evidence at the PCR hearing establishes that if they had made an appropriate challenge, it would have had a significant impact on the guilt phase of this case.

First, we note that the testimony from both trial counsel at the PCR hearing indicates how crucial the gunshot residue evidence was to respondent's defense. They had not expected the results to come back negative, and those negative results

---

**14.** In *Strickland,* the United States Supreme Court explained that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining" whether counsel's performance is reasonable. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. 2052. More recently, the Supreme Court again clearly enunciated that the reasonableness of counsel's conduct may be measured by the ABA's guidelines for capital defense. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Additionally, "[t]he ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland.* They are the same type of longstanding norms referred to in *Strickland* in 1984." *Hamblin v. Mitchell,* 354 F.3d 482, 487 (6th Cir.2003).

considerably undermined respondent's account of the incident. While counsel did seek out an expert, counsel nevertheless was deficient for retaining Avery, Powell's former SLED supervisor, as their expert. Although Avery was no longer working for SLED in 1996 when he was retained as a defense expert, the PCR court correctly found that Avery was not **an independent** expert because he had reviewed the gunshot residue report in his role as Powell's supervisor.[15] In order for Avery to question Powell's findings he would have implicitly had to have cast doubt on his own oversight of that very same analysis. Although there is no evidence that Avery did, in fact, render a biased opinion to defense counsel, we agree with the PCR court that it was unreasonable for counsel to choose Avery as their only expert on the critical gunshot residue analysis. *See Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. 2052 ("counsel's function ... is to make the adversarial testing process work in the particular case"); *ABA Guidelines, supra* (recommending independent investigation as well as an "aggressive re-examin[ation]" of all of the State's forensic evidence).

Furthermore, we note that the State—during both Avery's testimony and its closing argument—emphasized for the jury the fact that Avery had been hired by the defense and nonetheless had confirmed Powell's conclusions.[16]

■■■ Additionally, counsel did not discuss the gunshot residue analysis at all with Powell during their pretrial investigation. Powell testified at PCR that he would have explained to defense counsel why he believed some of the particles were "interesting;" this discussion would have given counsel an

---

**15.** We reject the dissent's suggestion that we are holding it was a lack of time which caused counsel's unreasonable decision regarding the retention of Avery as respondent's gunshot residue expert. Indeed, we agree with the dissent that counsel "expeditiously" retained an expert. We disagree, however, with the dissent's view that this expert must be presumed to be an appropriate one. Given his previous involvement in the case while employed with SLED, any presumption about his objectivity is untenable.

**16.** The Deputy Solicitor specifically argued in closing that the defense could not attack Powell's testimony "because their own expert, Mike Avery, was hired by the defense to review Mr. Powell's work.... He found no fault with Joe Powell's findings...."

opportunity to prepare an effective cross-examination which would have resulted in Powell testifying that the evidence was not inconsistent with Coffey handling the gun. In our opinion, counsel were unreasonable in not exploring the gunshot residue evidence with Powell prior to trial. *Troedel v. Wainwright, supra* (counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case); *see also ABA Guidelines,* 31 Hofstra L.Rev. at 1019 ("counsel should seek out and interview potential witnesses").

■ Even at trial, however, Powell's testimony clearly alluded to some uncertainty in the evidence. Powell testified there were "several particles which were **very interesting,** but there was not any **or enough** material for us to be able to call gunshot residue; thus, [Coffey] ha[d] no gunshot residue on her hands." (Emphasis added). Counsel should have cross-examined Powell as to what he meant by "very interesting" and not "enough material." Had counsel asked these questions, Powell would have filled the "hole" in the defense which they thought was created (but actually was not) by Powell's ultimate conclusion of "no gunshot residue." Accordingly, we find that counsel's decision to not cross-examine Powell on the gunshot residue evidence was not an objectively reasonable strategy. *See Ingle v. State,* 348 S.C. 467, 474, 560 S.E.2d 401, 405 (2002) (counsel must articulate an objectively reasonable strategy to avoid a finding of ineffectiveness).

■ Moreover, the State's heavy reliance in closing argument on the lack of gunshot residue further supports how critical it would have been if counsel had elicited testimony from Powell that the evidence indeed was consistent with Coffey handling a gun. The Deputy Solicitor argued:

> if there is no gunshot residue on her hands, as Joe Powell told you, then her hand wasn't on that gun when it went off. Her hand wasn't near that gun when it went off . . . . if they can't discount Joe Powell, if they can't discount those tests, then they can't get past the fact that there is no residue and then everything else they have raised is absolutely irrelevant, everything. . . . They have got to—got to—discount the value of those tests.

Respondent clearly showed that counsel could have established that while there was a scientific finding of "no gunshot residue," there nevertheless was evidence consistent with (but not conclusive of) Coffey handling the gun. Had counsel elicited this testimony from Powell, the State would not have been able to attack the defense theory as convincingly as it did.

The State's heavy reliance on defense counsel's failure to challenge this gunshot residue evidence highlights both the deficiency by counsel and the resulting prejudice. We note that the jury apparently did not believe this to be an open-and-shut case of murder because after deliberating for an hour, the jury asked for further clarification from the trial court on the definitions of murder and involuntary manslaughter. It is also worth noting that because the jury did have the option of involuntary manslaughter, it could have accepted respondent's account and yet still found him criminally responsible for the victims' deaths.[17]

Finally, we disagree with the dissent's suggestion that the PCR court found ineffective assistance of counsel based on respondent's introduction at the PCR proceedings of an expert who conclusively found gunshot residue. The PCR court's findings are based almost exclusively **on Powell's testimony** as to what information he would have provided to counsel if only they had asked—either prior to trial or on cross-examination. Neither this Court, nor the PCR court, has handed respondent a "second chance" because he has, many years

---

17. The trial court instructed the jury that involuntary manslaughter is the "unlawful killing of another without malice, express or implied, by some act or omission constituting criminal negligence. Criminal negligence is the reckless disregard of the safety of others." The trial court further instructed the jury that if there was a reasonable doubt as to whether respondent was guilty of murder or manslaughter, then the jury must "give him the benefit of the doubt and find him guilty of manslaughter." During the guilt phase, there was much testimony about drug use and drug dealing by respondent and his acquaintances. There was also testimony about how respondent carried a gun and that the gun was on the floor of the trailer before Coffey was shot. Considering this evidence, we find the jury could have believed respondent's account and yet could have also decided that respondent recklessly disregarded the safety of his pregnant girlfriend and unborn son, therefore allowing the jury to return a verdict of involuntary manslaughter.

after conviction, found a favorable expert. Instead, the PCR court properly focused on the evidence that counsel failed to appropriately examine the State's forensics evidence and failed to obtain the assistance of **an appropriate** expert. Likewise, it is the evidence available at the time of trial which we, too, rely upon to uphold the PCR court's grant of relief.

In sum, we hold counsel's decisions regarding the investigation of, and failure to challenge, the gunshot residue evidence were unreasonable and clearly deficient, especially given the fact that this was a capital case with an arguable defense to the guilt phase. There is ample probative evidence to support the PCR court's factual findings of deficient performance compelling us to affirm. *Webb v. State, supra* (if there is any evidence of probative value to support the PCR court's factual findings, the Court will uphold the findings). Moreover, the PCR court correctly found prejudice. In our opinion, without counsel's errors, there is a reasonable probability the jury would have had a reasonable doubt as to whether respondent was guilty of murder. *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. 2052.

Accordingly, the PCR court's rulings that trial counsel was ineffective and respondent is entitled to a new trial are **AFFIRMED.**

MOORE and PLEICONES, JJ., concur. TOAL, C.J., dissenting in a separate opinion in which BURNETT, J., concurs.

Chief Justice TOAL:

I respectfully dissent. I would reverse the decision of the PCR court. In my opinion, Ard's trial counsel adequately investigated the issue of gunshot residue on the victim's hands and their failure to cross-examine the State's gunshot residue expert was neither deficient nor prejudicial to Ard.

In order to establish a claim of ineffective assistance of counsel, a PCR applicant must show (1) the performance of counsel was deficient and, (2) but for the errors of counsel, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to the majority, Ard's two trial counsel

were deficient in failing to pursue the State's gunshot residue expert witness vigorously enough with respect to his conclusion that the victim had no gunshot residue on her hands. The majority also finds Ard's counsel failed to adequately perform their own investigation into the gunshot residue results. The facts, in my opinion, are to the contrary.

In preparation for trial, Ard's counsel did, in fact, hire their own gunshot residue expert to review the gunshot residue test results furnished by the State. Counsel did not ultimately produce this expert as a witness at trial because, upon review of the test results, the expert then indicated to trial counsel that he concurred with the State's expert's conclusion. Instead, at trial, the State called the expert originally obtained by Ard to testify that he had agreed with the State's own expert's findings. In my opinion, Ard's trial counsel appropriately countered this testimony with a cross-examination which called into question the accuracy of the gunshot residue test results. Specifically, counsel elicited testimony from the expert suggesting that the process of fingerprinting the victim would have "interfered" with the gunshot residue test results if done prior to trace evidence collection. Simply stated, Ard's trial counsel sufficiently dealt with the adverse evidence. The fact that Ard's counsel could not force their own qualified expert to tailor his opinion to fit their theory of the case, in my view, is an insufficient basis on which to conclude that these counsel were deficient.

The majority bases its conclusion in part on the PCR court's finding that the expert retained by Ard's counsel was not "independent" because of his prior involvement with the gunshot residue analysis during his employment with SLED. In my opinion, this is rank speculation, not supported by any evidence of bias in the record. Without more, this assumption does not support the majority's conclusion that selection of this expert by counsel was unreasonable.

Moreover, in the face of unfavorable gunshot residue results, counsel for Ard independently investigated the facts and circumstances of the case by performing their own thorough investigation of the crime scene and hiring experts in both engineering and crime scene investigation in order to corroborate Ard's account of the gun's accidental discharge. Counsel

also developed their theory on the accuracy of the gunshot residue results by interviewing three witnesses regarding the handling of the victim's body at the scene. In light of these independent investigations, the fact that counsel did not conduct pre-trial questioning of the State's expert on the results of the gunshot residue analysis, in my opinion, does not fall below an objective standard of reasonableness. *See Simpson v. Moore*, 367 S.C. 587, 627 S.E.2d 701 (2006) ("A decision 'not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' ")

Additionally, the record shows a thorough factual explanation by the State's expert who testified that there were not enough indicator particles to conclude there was gunshot residue on the victim's hand. Again, in my view the fact that Ard's trial counsel could not force the State's gunshot residue expert to change his opinion is an insufficient basis on which to conclude that these counsel were deficient. Moreover, the fact that eight years later, PCR counsel were finally able to retain an expert who reached a conclusion favorable to Ard's case (i.e. that the victim's hands contained traces of gunshot residue) does not imply that trial counsel were deficient for failing to find such an expert at the time of the trial.[18] To hold otherwise declares open season on the criminal justice system by giving a "second chance" to any convicted criminal who is patient enough to seek out an "expert" who will one day provide him with the opinion testimony he desires.[19]

18. The record shows that trial counsel received the State's gunshot residue results on February 2, 1996, and the underlying raw data on March 1, 1996. The majority implies that the time between February 2, 1996, and April 15, 1996, when the trial was scheduled to begin, was insufficient for trial counsel to retain a qualified gunshot residue expert. However, those in the legal profession are well aware that trial preparation does not occur in a perfect world. In my view, we must presume Ard's trial counsel operated appropriately and expeditiously in retaining their expert because there is no evidence that the expert, a former supervisor in SLED's trace evidence department, was biased or otherwise unqualified to perform an accurate evaluation of the State's results on such "short notice."

19. Additionally, I note that in support of their conclusion that trial counsel were deficient, the majority cites extensively to American Bar Association (ABA) guidelines on the prevailing norms of practice. The majority justifies their reliance on ABA guidelines by pointing to an

Furthermore, even if these trial counsel were deficient, Ard failed to demonstrate that the deficiency prejudiced his case. The State presented twenty witnesses to show that Ard killed the victim with malice. Although the State emphasized the lack of gunshot residue in its closing argument, in my opinion, the State presented other overwhelming evidence from which a jury could find Ard guilty of murder.

Although not addressed by the majority because of their findings on ineffectiveness of trial counsel, Ard also claimed that appellate counsel was ineffective for failing to directly appeal the dismissal of a juror during the sentencing phase. The juror's qualifications came under scrutiny after the second day of the sentencing phase when the juror's wife approached the trial judge complaining that her husband's jury duty was causing hardship for the family because of his inability to work. The juror's wife also commented that her husband's religious beliefs would not permit him to vote for the death penalty. When asked by the trial court during an in camera conference about his ability to be a fair juror, the juror responded that although he believed he could render a fair verdict under normal circumstances, the fact that his wife had raised doubts in the parties' minds as to his ability to be fair made him feel "targeted" regardless of his ultimate decision. When further questioned about his ability to vote for the death penalty, the juror stated, "I don't think I can be fair at

---

endorsement of ABA standards in *Strickland v. Washington*. In my opinion, however, the *Strickland* court makes it clear that the ABA standards, although helpful, are "only guides" for assessing reasonableness. 466 U.S. at 688, 104 S.Ct. 2052. In fact, the *Strickland* court cautions:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052. This Court has never adopted the ABA guidelines as the standard for prevailing professional norms in South Carolina. Therefore, in my view, "reasonableness" in the instant case is best assessed in the broader context suggested by *Strickland*.

this point." Despite multiple reassurances from the court that this matter would remain private and that the juror would not be accountable to anyone for his vote, the juror reiterated his concerns that his decision "would be a threat" to him and concluded that he could no longer cast a fair vote. The trial court released him from the jury.

In my view, Ard did not show that the failure of appellate counsel to directly appeal the dismissal of the juror amounted to ineffective assistance of counsel. In a PCR proceeding, the burden is on the applicant to prove the allegations in his application. *Patrick v. State,* 349 S.C. 203, 207, 562 S.E.2d 609, 611 (2002). Although Ard supported his argument that counsel was deficient with testimony from appellate counsel acknowledging that he erred in not raising the juror's dismissal on appeal, Ard did not satisfy his burden of proof with a showing of how the juror's dismissal prejudiced his case. In my view, there was nothing prejudicial about the dismissal of a juror who stated that he would feel "targeted" as to his decision and ultimately admitted that he did not believe he could cast a fair vote. Therefore, in my opinion, the PCR court incorrectly determined that the failure to directly appeal the trial court's dismissal of a juror amounted to ineffective assistance of counsel.

For the foregoing reasons, I would hold that the actions of neither trial counsel nor appellate counsel resulted in prejudice against Ard. Accordingly, I would reverse the PCR court's finding of ineffective assistance of counsel based on the failure of trial counsel to adequately investigate and challenge the gunshot residue. I would also reverse the PCR court's finding of ineffective assistance of counsel based on the failure of appellate counsel to raise the issue of the trial court's dismissal of a juror on direct appeal.

BURNETT, J., concurs.