775 S.E.2d 391

Edward FREIBURGER, Petitioner,

v.

STATE of South Carolina, Respondent.

Appellate Case No.2010–177147.

No. 5295.

Court of Appeals of South Carolina.

Heard Oct. 16, 2014.

Decided Feb. 11, 2015.

Rehearing Denied Aug. 21, 2015.

John H. Blume, III, Blume Norris & Franklin–Best, LLC, and Lindsey Sterling Vann, both of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson and Assistant Attorney General Megan E. Harrigan, both of Columbia, for Respondent.

FEW, C.J.

In 2001, the State indicted Edward Freiburger for a murder that occurred in 1961. Following his conviction and the denial of his direct appeal, Freiburger filed an application for post-conviction relief (PCR), claiming ineffective assistance of counsel. We find the PCR court correctly denied PCR as to all issues except one—Freiburger's claim that trial counsel was ineffective for failing to introduce a letter written in 1961 by

the Chief of SLED, J.P. Strom, to the director of the FBI, J. Edgar Hoover. We find the letter would have deeply undermined the foundation of the State's case—its ballistics evidence. We reverse the denial of PCR as to this issue and remand to the court of general sessions for a new trial.

## I. Facts and Procedural History

John Orner was a taxi driver in Columbia who regularly transported soldiers to and from the local U.S. Army base— Fort Jackson. On the evening of February 28, 1961, Orner did not return home after being dispatched to pick up a passenger at the base. Police found Orner's blood-stained taxi the next morning on the 1200 block of Assembly Street, near its intersection with Gervais Street. Two days later, police discovered Orner's body by the side of U.S. Highway 601 in lower Richland County. He died from a gunshot wound to the head. Forensic examinations of three bullet fragments removed from Orner's head indicated the bullet was fired from a .32 caliber Harrington and Richardson (H & R) revolver.

In March of 1961, Freiburger was arrested in Tennessee for hitchhiking, and police seized a .32 caliber H & R revolver he was carrying (the "Freiburger gun"). This gun was later given to Richland County authorities in connection with their investigation of Orner's murder. Ballistics experts examined bullets test-fired through the Freiburger gun, as well as another .32 caliber H & R revolver seized from the home of a local resident, Alonzo Dreher (the "Dreher gun"). These ballistics tests yielded inconclusive results, and no charges were brought at that time.

In 2000, the Richland County Sheriff's Department reopened the murder investigation. Lieutenant Ira Parnell, supervisor of the South Carolina Law Enforcement Division's (SLED) Firearms Identification Laboratory, reexamined the three bullet fragments and compared them to the test bullets fired by the Freiburger and Dreher guns. Lt. Parnell also fired his own test bullets with the Freiburger gun. He later issued a report stating the results "were inconclusive" and the bullet fragments "could have been fired by [the Dreher gun], [the Freiburger gun], or by another similarly rifled firearm of the same caliber." Also in 2000, four other SLED ballistics

experts compared the test bullets with the three bullet frag-
ments and reached the same inconclusive results. However,
John Cayton, a private ballistics expert hired by the Sheriff's
department, concluded striations on one of the bullet frag-
ments matched markings on test bullets from the Freiburger
gun, and not the Dreher gun or any similar caliber H & R
gun. On the basis of Cayton's opinion, the State indicted
Freiburger for the murder of Orner.

At trial, Freiburger was represented by John Delgado and
Kathrine Hudgins. Cayton and Lt. Parnell testified as ex-
perts for the State. The jury found Freiburger guilty of
murder, and the trial court sentenced him to life in prison.
The supreme court affirmed his conviction. *State v. Freibur-
ger*, 366 S.C. 125, 620 S.E.2d 737 (2005).

Freiburger filed a PCR application, claiming trial counsel
was ineffective for several reasons, including not introducing
into evidence Chief Strom's 1961 letter to Hoover (the "Hoo-
ver letter"). According to the Hoover letter, Lieutenant Mil-
lard Cate—the head of SLED's Firearms Identification Labo-
ratory in 1961—performed comparative ballistics tests on the
three bullet fragments and test bullets fired through the
Freiburger and Dreher guns. In the letter, Chief Strom
stated "Lt. Cate is of the opinion that [the Dreher] weapon
killed the taxi driver." [1] The letter further stated that al-
though Lt. Cate noted some similarities between the test
bullets from the Freiburger gun and the bullet fragments, he
was "unable to establish an identification of any kind." Ac-
cording to the letter, the "Army Firearms Examiner" also
reached inconclusive results as to the Freiburger gun.

The PCR court initially found trial counsel was not deficient
for failing to introduce the letter. In its order denying
Freiburger's Rule 59(e), SCRCP, motion, however, the court
stated, "It may have been error to not try to use the letter in

---

1. While the record does not reveal how police came to suspect the
Dreher gun was involved in the murder, the Hoover letter provides the
following information: "[The Dreher gun] was recovered in a house
where it is possible that any number of persons could have carried it
out. However, the owner Alonzo Dreher, who is an old man, says that
he does not believe that anyone had his gun. A number of known
thieves and robbers, including members of his own family, have been in
this house from time to time."

some manner or for some purpose." Notwithstanding this, the court denied PCR because it found Freiburger did not prove he was prejudiced by trial counsel's error. This court granted Freiburger's petition for a writ of certiorari.

## II. Ineffective Assistance of Counsel

■ Under the two-pronged test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a PCR applicant alleging ineffective assistance of counsel must show: (1) trial counsel "failed to render reasonably effective assistance under prevailing professional norms," *Porter v. State*, 368 S.C. 378, 383, 629 S.E.2d 353, 356 (2006); and (2) "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Suber v. State*, 371 S.C. 554, 558, 640 S.E.2d 884, 886 (2007). As to the first prong, Freiburger must prove trial counsel's performance was deficient, "meaning that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Edwards v. State*, 392 S.C. 449, 456, 710 S.E.2d 60, 64 (2011) (citation and quotation marks omitted). If the State contends the alleged deficiency resulted from a strategic decision made at trial, counsel "must articulate a valid reason for employing a certain strategy." *Ingle v. State*, 348 S.C. 467, 470, 560 S.E.2d 401, 402 (2002) (emphasis removed). As to the second prong, Freiburger must show there is a "reasonable probability" that, absent trial counsel's error, "the jury would have had a reasonable doubt as to [his] guilt." *Edwards*, 392 S.C. at 459, 710 S.E.2d at 66; *see also Lounds v. State*, 380 S.C. 454, 459, 670 S.E.2d 646, 649 (2008) ("[W]hen a defendant's conviction is challenged, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." (citation and internal quotations marks omitted)).

Freiburger argues trial counsel was ineffective for failing to introduce the Hoover letter at trial. He correctly points out the letter was the only evidence establishing the Dreher gun as the murder weapon—a scenario under which Freiburger could not be the person who killed Orner. He argues the letter should have been used to contradict Cayton's opinion that the Freiburger gun was the murder weapon, refute a

SLED examiners' testimony that he and Lt. Cate "exclude[d]" the Dreher gun, and corroborate the inconclusive results reached by multiple SLED examiners as to the Freiburger gun.

## A. Deficiency—The First Prong of *Strickland*

██ We begin our analysis of whether Freiburger met the first prong of *Strickland* with the State's concession that the letter would have been admissible at trial. When questioned at oral argument regarding the admissibility of the letter, the State responded, "I think it would have been admissible at trial."

The PCR court's statement in its Rule 59(e) order—"[i]t may have been error to not try to use the letter in some manner or for some purpose"—appears to be a finding of deficiency. There is ample evidence in the record to support this finding. *See Moore v. State,* 399 S.C. 641, 646, 732 S.E.2d 871, 873 (2012) (providing an "any evidence" standard for reviewing a PCR court's ruling). However, to the extent the PCR court did not find Freiburger proved the first prong of *Strickland,* we hold the court's decision is not supported by the evidence. *See Lorenzen v. State,* 376 S.C. 521, 529, 657 S.E.2d 771, 776 (2008) ("A PCR court's findings will be upheld on appeal if there is 'any evidence of probative value sufficient to support them.' " (citation omitted)).

The letter would have been highly beneficial to Freiburger for multiple reasons. First, the letter stated Lt. Cate was "of the opinion" the Dreher gun was the murder weapon, which would have been the only evidence that directly contradicted Cayton's positive identification of the Freiburger gun. Lt. Cate's "opinion" stands out because the State successfully presented the other experts' "inconclusive" ballistics results as not being inconsistent with Cayton's opinion, but different only by a matter of degree. For example, Lt. Parnell testified:

> My opinion was that it was an inconclusive result, and there are degrees of inconclusive . . ., from no similarities noted, to a lot of similarities noted, to not quite enough. In the case of . . . the bullet fragment from Mr. Orner's head . . . and [the Freiburger gun], I found a remarkable similarity. . . . It was just not quite enough for me to conclude that

it was fired out of that revolver and no other gun ever made.

The State ended its direct examination of Lt. Parnell by asking, "And the other examiners at SLED, . . . Lt. Defreese, Mr. Collins, Mr. Whittler, Mr. Paavel, their opinion agrees with yours?" Lt. Parnell responded, "That's correct."

Second, Lt. Cate's opinion regarding the Dreher gun would have discredited Lt. Parnell's testimony that "[he] saw no similarity between" the bullet fragments and test bullets fired through the Dreher gun. The letter indicates Lt. Cate saw enough similarities that he reached "the opinion that [the Dreher] weapon" did it. Third, the letter could have been used to undermine the inconclusive results reached by the other SLED examiners as to the Dreher gun because the letter indicates the results of Lt. Cate's ballistics tests were not inconclusive. Fourth, Lt. Cate's opinion as to the Freiburger gun matched the inconclusive results reached by other SLED examiners. The letter states Lt. Cate observed "some similarities," but he "was unable to establish an identification of any kind."

Finally, the letter contradicted the testimony of another expert for the State, Carl Stokes, who worked for SLED from 1954 until 1981. It would have been particularly important to impeach Stokes with the letter because the State framed his testimony in terms of his relationship with Lt. Cate. Specifically, Stokes testified, "I was [Lt. Cate's] first understudy," and he described all the work he did in this case in terms of his collaboration with Lt. Cate. Stokes explained how "Mr. Cate and I went to the Dunbar Funeral Home" because "the body of John Orner was there . . . and we were there to assist in the recovery of the bullet." Stokes then testified, referring to Lt. Cate and himself, "We recovered three fragments of a bullet," which "remained in our custody," and "Mr. M.M. Cate's initials are on the vial" containing the fragments. Stokes repeatedly identified Lt. Cate's initials on various containers, and then described the work he and Lt. Cate did and the results they reached. He testified "we were able to determine that the fragments were fired from an H & R .32 revolver," "we concluded it was from one bullet," and "we were able to measure the groove of the bullet and determine

that it was the same width as a Harrington & Richardson weapon."

Stokes then testified to the conclusions he and Lt. Cate reached regarding the Dreher and Freiburger guns, specifically that "*we* were able to exclude the [Dreher gun]." (emphasis added). The State asked Stokes to elaborate:

Q: And when you say "excluded," explain what that means to us, Mr. Stokes?

A: In comparing the test bullet with the known specimen, you're looking for identifying characteristics, those characteristics that have been imparted on the bullet from the barrel, . . . the individual scratch marks as it passes through the barrel. We look for those identifying characteristics to match together, and we did that in this particular case.

Q: And the [Dreher gun] was excluded?

A: *We* excluded it, yes, sir.

Q: It did not fire that bullet?

A: It did not fire the fragments that we had.

(emphasis added). Stokes later testified as to Lt. Cate, "I don't ever recall any results coming out of the lab that we didn't agree on," and as to the particular results in this case, "Mr. Cate [and I] came to the same opinion."

Stokes' claim that he and Lt. Cate "were able to exclude" the Dreher gun cannot be reconciled with Chief Strom's statement in the Hoover letter—"Lt. Cate is of the opinion that [the Dreher gun] killed the taxi driver." The letter demonstrates Stokes testified incorrectly when he stated, "We were able to exclude [the Dreher gun]" and Lt. Cate concluded "[i]t did not fire the fragments that we had."

This discussion demonstrates the multiple ways trial counsel could have effectively used the letter to benefit the defense. In the face of these benefits, the record contains no basis for a decision not to introduce the letter into evidence. Hudgins testified she knew of no reason why the Hoover letter was not introduced. The PCR court found Delgado saw the letter and "specifically list[ed]" it on an index he created of discovery materials provided by the State. When Delgado was asked at the PCR hearing, "[D]id [you] have a strategic reason not to

use this letter?" he responded, "No, sir." Delgado further stated in an affidavit submitted to the PCR court, "I do not presently remember why I did not use the letter at trial and I cannot think of any strategic reason why I would have decided not to use it." In the same affidavit, Delgado stated the letter "would have been powerful evidence." [2]

We therefore find trial counsel's failure to introduce the Hoover letter requires a finding of deficiency. The letter contains evidence that would have been favorable to Freiburger in several important ways. Trial counsel has not articulated any reason for not introducing it, nor has the State argued there could be such a reason. Thus, counsel's failure to introduce the letter into evidence was so serious an error that it rendered counsel's performance deficient under the first prong of *Strickland.* See *Edwards,* 392 S.C. at 456, 710 S.E.2d at 64.

### B. Prejudice—The Second Prong of *Strickland*

 We find Freiburger also met his burden of proof as to the second prong of *Strickland* because there is a reasonable probability the jury would have had a reasonable doubt as to whether he was guilty of murder if trial counsel had introduced the letter at trial. *See* 392 S.C. at 459, 710 S.E.2d at 66.

To frame our discussion of prejudice, we point out the evidence against Freiburger was purely circumstantial, and—other than ballistics—weak. The supreme court discussed the extent of the evidence in affirming the denial of Freiburger's directed verdict motion:

> The evidence adduced at trial which tended to implicate Freiburger was as follows: 1) he was a soldier stationed at

---

2. We hesitate to embrace Delgado's testimony. The PCR court stated Delgado "was evasive in his testimony" and gave examples to illustrate Delgado's evasiveness. The PCR court noted significant inconsistencies between Delgado's affidavit and his live testimony and found, "this court does not believe [Delgado's] affidavit testimony." We agree with the PCR court. Delgado made no attempt to defend his actions as trial counsel, but attempted to cast those actions as deficient. He so clearly continued in the PCR proceedings to act as an advocate for Freiburger that the PCR court allowed the State to treat him as a hostile witness. *See* Rule 611(c), SCRE ("When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.").

Fort Jackson on February 28, 1961, 2) he had a habit of pawning his personal property at downtown Columbia pawn shops, 3) he purchased a .32 caliber H & R revolver, serial number W9948, and bullets from the Capital Loan and Pawn shop on February 28, 1961, 4) the victim was shot on February 28, 1961 with a .32 caliber H & R revolver, 5) two days after the victim's cab was found, Freiburger stayed at a downtown motel in close proximity to where Victim's bloody cab was found, 6) Freiburger was arrested in Tennessee on March 29, 1961 carrying a .32 caliber H & R revolver, 7) [ballistics], and 8) Freiburger was evasive when talking to Richland County police investigators in Indiana in September 2000, claiming he did not recall having been in the army, or having been stationed at Fort Jackson.

*Freiburger*, 366 S.C. at 137, 620 S.E.2d at 743. In fact, the State did not indict Freiburger for forty years following Orner's death. Instead, the State brought charges only after it obtained ballistics evidence directly tying Freiburger's gun to the murder—Cayton's expert opinion.

It is also important to note the manner in which the State portrayed Lt. Cate during trial. In addition to the testimony recited above, Stokes testified Lt. Cate was "one of the building blocks" of SLED's firearms identification division who always tried "to avoid an inconclusive" ballistics result. Stokes testified Lt. Cate "did everything possible . . . to identify any weapon that we got. . . . [Lt. Cate] lived by not messing with [the] in between, and we had very few inconclusives." The State began its questions to Lt. Parnell by asking whether he knew and worked for Lt. Cate, and specifically pointed out "you worked with and knew [Lt. Cate] before 1973," but after that "you were under his supervision." In its closing argument, the State emphasized Lt. Cate's positive character, stating, "Mr. Cate must have been a heck of a man, a heck of a man, and he didn't want [anything] in between, no sir, no ma'am. He excluded everything."

The weakness of the State's non-ballistics evidence and the State's efforts to use the expertise of Lt. Cate to its advantage at trial frame our analysis of the importance of the Hoover letter to Freiburger's defense. With this in mind, we find the Hoover letter would have undermined the State's ballistics evidence in three particular ways.

First, it would have negatively impacted the certainty of Cayton's opinion that the Freiburger gun was the murder weapon. The State relied heavily on Cayton's ballistics analysis to convict Freiburger. As Delgado testified at the PCR hearing, "Without John Cayton, the solicitor did not have a case." In fact, Cayton's opinion that the Freiburger gun killed Orner is the only additional evidence the State added since 1961, when it decided not to prosecute Freiburger. Because the State built its case around Cayton's positive identification of the Freiburger gun, Lt. Cate's contrary opinion that the Dreher gun fired the fatal bullet—the only evidence available to *contradict* Cayton's opinion—would have been a great benefit to Freiburger's defense. *See McKnight v. State,* 378 S.C. 33, 55, 661 S.E.2d 354, 365 (2008) (finding counsel's failure to introduce evidence prejudiced defendant because it would have undermined the conclusion of the only expert who testified that the defendant's actions caused the victim's death).

Second, introduction of the letter would have disrupted the apparent unanimity of the State's experts. Cayton's positive identification of the Freiburger gun gained strength from the corroborative effect of Stokes' and Lt. Parnell's trial testimony, and Lt. Parnell's statement that the other SLED experts—none of whom testified at trial—agreed with him. Specifically, Stokes and Lt. Parnell testified they were able to exclude the Dreher gun, but reached inconclusive results regarding the Freiburger gun. Their exclusion of the Dreher gun made the inconclusive results as to the Freiburger gun logically consistent with Cayton's opinion. However, Lt. Cate's opinion that the Dreher gun was the murder weapon would have prevented this corroborative effect. Specifically, Lt. Cate's opinion that the Dreher gun was the murder weapon necessarily excluded the Freiburger gun—because only one gun could be the murder weapon. Thus, introduction of the letter would have transformed an apparent consensus among firearms examiners into a conflict among experts regarding which gun fired the fatal bullet. *See Ard v. Catoe,* 372 S.C. 318, 330, 642 S.E.2d 590, 596 (2007) (affirming finding of prejudice because "the extent to which the jurors credited [expert]'s testimony ... was critical to the outcome of the case" and "counsel's failure to refute ... evidence transformed

an arguable case into a clear case" (internal quotation marks omitted)).

Finally, the letter was important for impeachment purposes, as it contradicted Stokes' testimony regarding the results of the ballistics tests he and Lt. Cate performed in 1961. Because trial counsel did not use the letter, the jury was left with the belief that Lt. Cate excluded the Dreher gun—the direct opposite of what Chief Strom wrote in the Hoover letter.

To support its finding of no prejudice, the PCR court relied on Lt. Parnell's testimony at the PCR hearing. Specifically, Lt. Parnell was asked if he was familiar with a letter written by Lt. Cate in 1961, to which he responded, "Well, Mr. Cate didn't write it." He was then asked if the letter indicated that Lt. Cate believed the Dreher gun killed Orner. Lt. Parnell responded, "I see that in the letter. But I also know that Mr. Cate didn't write a formal report indicating one way or the other. But ... that is what [the letter] says." Based on this testimony, the court found the presentation of the letter was "not useful to [Freiburger] and would have probably been detrimental if done at trial."

While Lt. Parnell's testimony at the PCR hearing was dismissive of Lt. Cate's opinion in the Hoover letter, his testimony does not support a finding of no prejudice. The PCR court also concluded no prejudice resulted based on "Mr. Delgado's explanation that he ... did not ascribe great importance to [the letter]." There is no evidence whatsoever to support this finding. In fact, all statements in Delgado's affidavit and live testimony—such as that the letter "would have been helpful" and constituted "powerful evidence" for the defense—directly contradict the court's finding.

The State discounts the importance of the letter, arguing Chief Strom sent the letter to request additional ballistics testing by the FBI, which demonstrates Lt. Cate was unsure of his conclusion. The State contends this decreases any prejudicial effect of trial counsel's failure to introduce the letter at trial. We believe the State's argument overlooks the importance of the letter to Freiburger's case. It is true Chief Strom requested additional ballistics testing from the FBI. However, the letter demonstrates one of the reasons for the State's request—Lt. Cate believed the Dreher gun was the

murder weapon, and thus the State had nobody to prosecute. While we acknowledge Lt. Cate may not have been certain, Chief Strom chose to write "Lt. Cate is of the opinion that [the Dreher] weapon killed the taxi driver," and these are the words the jury would have heard if counsel had introduced the letter. Lt. Cate's uncertainty makes his "opinion" only marginally less significant.

The State best illustrated the importance of the Hoover letter in its own closing argument, in which the solicitor stated,

> Who excludes this gun? If it's excluded, find him not guilty. If one person put their hand on this Bible, swore to tell the truth and said, "This is not the gun that murdered John Orner," find him not guilty. . . .

By the State's own challenge to the jury during closing argument, the existence of an "opinion" that the Dreher gun killed Orner reasonably could have changed the outcome of trial.

We find no evidence to support the PCR court's determination that Freiburger failed to prove prejudice. Rather, we find the admission of the Hoover letter would have deeply undermined the State's case. Counsel's failure to introduce the letter leaves us without confidence in the outcome of the trial. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 (stating as to the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"). Accordingly, we hold the court erred in denying PCR.

## III. Conclusion

The order of the PCR court is **REVERSED** and the case is **REMANDED** to the court of general sessions for a new trial.

LOCKEMY, J., concurs.

THOMAS, J. (concurring in part and dissenting in part).

I agree with the majority that the PCR court correctly denied Freiburger relief on the issues he raised concerning

alleged violations of *Brady v. Maryland*[3] and *Crawford v. Washington.*[4] I also agree with the majority's decision to affirm the PCR court's refusal to grant relief due to trial counsel's alleged failure to use the Parnell Report when cross-examining Lt. Parnell. As to the Hoover letter, I do not dispute that Freiburger's trial counsel had been informed of its existence and that we should not address whether the evidence would have been admissible in view of the State's concession during oral argument. I write separately, however, because I would affirm the PCR court's findings that Freiburger's trial counsel was not ineffective for failing to introduce the letter and that this failure was not prejudicial to Freiburger.

"The burden is on the applicant in a post-conviction proceeding to prove the allegations in his application." *Brannon v. State,* 345 S.C. 437, 439, 548 S.E.2d 866, 867 (2001) (citation omitted). Although "[a]n appellate court must affirm the PCR court's decision when its findings are supported by any evidence of probative value, . . . an appellate court will not affirm the decision when it is not supported by any probative evidence." *Id.* (citations omitted).

"To establish the requisite prejudice necessary to prove a claim of ineffective assistance of counsel, [a PCR applicant] must demonstrate that his attorney's errors had an effect on the judgment against him." *Edwards v. State,* 392 S.C. 449, 458–59, 710 S.E.2d 60, 65 (2011). To accomplish this, the applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[W]hen a defendant's conviction is challenged, 'the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.' " *Ard v. Catoe,* 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007) (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052).

---

3. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

4. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The PCR court found Freiburger failed to satisfy his burden to demonstrate with any credible probative evidence that use of the Hoover letter would have made the outcome of the trial any different. To support this finding, the court noted that at the PCR hearing, firearms expert Lt. Parnell was cross-examined regarding the letter and the results of the cross-examination were not useful to Freiburger. The court further found Parnell's testimony would probably have been detrimental to Freiburger had the cross-examination been conducted during his trial. I agree with the PCR court's assessment of Parnell's testimony and would hold this is evidence that would support the PCR court's finding that use of the Hoover letter at trial would most likely not have benefited Freiburger.

During the PCR hearing, Parnell acknowledged that he was familiar with the letter and knew it stated that Lt. Cate was of the opinion the Dreher weapon was used to kill the victim. However, Parnell also mentioned that the letter revealed that Cate, though his opinion was based on bullet comparisons, "withheld a formal report because of the condition of the bullet." Furthermore, the letter was addressed to the attention of the Firearms Laboratory of the Federal Bureau of Investigation, and as Parnell acknowledged on cross-examination, "was written for the purpose of obtaining, attempting to obtain assistance from the FBI in doing an additional examination of the bullet." Parnell also testified that the bullet was in three fragments and showed signs of twisting and distortion that could have complicated the identification procedure. Furthermore, as Parnell testified, the letter mentioned that Cate did not document his opinion in a formal report and suggested he was reluctant to do this because the condition of the bullet undermined his confidence in his identification of the murder weapon. Therefore, although I agree with the majority that Cate's opinion, as stated in the Hoover letter, did not support Cayton's positive identification of the Freiburger gun, I would hold the letter, when considered in its entirety, presented only a differing but still tentative conclusion that another weapon was involved. At best, then, the Hoover letter would only emphasize the difficulty law enforcement had in determining in 1961 who owned the .32 caliber Harrington and Richardson revolver that killed the victim, an

uncertainty that should have been readily apparent in view of the other evidence presented at trial and the fact that many years passed before anyone was charged in the case. To the extent the letter presented a different opinion about the murder weapon, it also suggested that the individual to whom the opinion was attributed had valid concerns about the reliability of his identification and the condition of the physical evidence upon which this identification was based.

The majority also finds introduction of the Hoover letter would have been beneficial to Freiburger as a means to impeach Carl Stokes. The PCR court did not rule on this issue, and Freiburger, though he moved to alter or amend the judgment, did not request specific findings of fact or conclusions of law on whether the letter would have discredited Stokes's testimony; therefore, I would not hold Freiburger is entitled to PCR based on this rationale. *See Pruitt v. State,* 310 S.C. 254, 255, 423 S.E.2d 127, 128 (1992) ("[W]e are not abandoning the general rule that issues must be raised to, and ruled on by, the post-conviction judge to be preserved for appellate review.") (*quoted in Marlar v. State,* 375 S.C. 407, 410, 653 S.E.2d 266, 267 (2007)).

For the foregoing reasons, I would affirm the denial of PCR.